IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


**DAVID SCHUBERT,**

                    Plaintiff                          CV 10-3078-ST

            v.                                **FINDINGS AND**
                                              **RECOMMENDATION**

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

                    Defendant.


STEWART, Magistrate Judge:

        Plaintiff, David Schubert ("Schubert"), seeks judicial review of the Social Security

Commissioner's final decision denying his applications for Disability Insurance Benefits ("DIB")

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.

1 -  FINDINGS AND RECOMMENDATION

This court has jurisdiction under 42 USC § 405(g).  For the following reasons, the

Commissioner's decision should be affirmed.

## BACKGROUND

Schubert has a history of neck surgeries.  In 1992, Schubert had a diskectomy and C5-6

fusion.  Admin. R. 238.[1]   He then reportedly sustained a neck injury in a motor vehicle accident

in August 1995, after which he had fusion surgery at C4-5.  *Id.*  In August 1998, he underwent a

diskectomy and C3-4 fusion.  *Id.* at 220-37.  In October 1999, Schubert underwent a C5-7 fusion.

*Id.* at 192-93.

Schubert filed applications for DIB and SSI on June 3 and 8, 2005, alleging he became

unable to work on January 1, 1997, due to ongoing effects of his neck injury, including numbness

in his right hand and arm, numbness in his upper arm, pain in his shoulders and neck, and

debilitating headaches.  *Id.* at 76-78, 99-100, 531-35.   He satisfied the insured status

requirements of the Social Security Act through June 30, 2002.  *Id.* at 23, 35-36.  To prevail on

his claim under Title II, a DIB claimant must establish that his disability began on or before the

date last insured.  *Tidwell v. Apfel*, 161 F3d 599, 601 (9th Cir 1998).

After denial of his applications, Schubert requested reconsideration which also was

denied.  Admin. R. 37-41, 47, 53-58, 537-41, 543-45.  Schubert then timely requested a hearing.

*Id*. at 59.  Hearings were held on October 7, 2007, and on January 18, 2008 (to address

discrepancies in the record), before Administrative Law Judge ("ALJ") William L. Stewart, Jr.

*Id*. at 561-628.  On February 4, 2008, the ALJ issued his decision finding Schubert not disabled.

---

[1]  Citations are to the pages indicated in the official transcript of the administrative record filed on January 13, 2011
(docket #12).

2 - FINDINGS AND RECOMMENDATION

*Id*. at 23-34.  The Appeals Council denied Schubert's request for review of the ALJ's decision.

*Id*. at 7-10, 18-19, 546-60.  The Appeals Council decision is a final decision of the

Commissioner, subject to review by this court.  20 CFR § 410.670a.

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five

steps in determining disability under the meaning of the Act.  20 CFR §§ 404.1520, 416.920;

*Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.

If he is, the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step

two, the ALJ determines if the claimant has "a severe medically determinable physical or mental

impairment" that meets the twelve month duration requirement.  20 CFR §§ 404.1509,

404.1520(a)(4)(ii), 416.909; 416.920(a)(4)(ii).  If the claimant does not have such a severe

impairment, he is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an

impairment "listed" in the regulations.  20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the

impairment is determined to equal a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other

relevant evidence in assessing the claimant's RFC.  The claimant's RFC is an assessment of

work-related activities the claimant may still perform on a regular and continuing basis, despite

limitations imposed by his impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security

Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

The ALJ uses this information to determine if the claimant can perform his past relevant work at step four.  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant can perform his past relevant work, he is not disabled.  If the ALJ finds that the claimant's RFC precludes performance of his past relevant work, or that the claimant has no past relevant work, the ALJ proceeds to step five.

At step five the Commissioner must determine if the claimant is capable of performing work existing in the national economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v), 404.1520(f), 416.920(a)(4)(v), 416.920(f).  If the claimant cannot perform such work, he is disabled.  *Id.*

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that "the claimant can perform some other work that exists in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id* at 1100.  If the Commissioner meets this burden the claimant is not disabled.  20 CFR §§ 405.1520(g), 416.920(g).

## ALJ's DECISION

The ALJ found that Schubert met the insured status requirement of the Social Security Act through June 30, 2002, and was 49 years old on that date.  Admin. R. 25, 31.  Applying the five-step analysis, the ALJ found at step one that Schubert had not performed substantial gainful activity during the relevant period.  *Id.* at 25-26.  At step two, the ALJ determined that Schubert's ability to perform basic work activities was significantly affected by degenerative disc disease of the cervical spine and asthma, but found that these disorders did not meet a listed impairment at

4 - FINDINGS AND RECOMMENDATION

step three.  *Id.* at 27-28.  The ALJ found that, despite these impairments, Schubert retained the

residual functional capacity ("RFC") to perform a range of work at the light level of exertion:

> He can frequently lift 10 pounds and occasionally lift up to 20
> pounds.  He can sit, stand and/or walk for six hours each out of an
> eight-hour workday, but he should avoid extremes of motion
> regarding neck postures.  As well, the claimant should avoid
> excessive dust or fumes, overhead reaching, crawling, or work that
> involves the use of ladders or scaffolds.

*Id.* at 30.

At step four, the ALJ determined that Schubert could not perform his past relevant work[2]

as a camera car driver.  *Id.* at 31.  At step five, the ALJ elicited testimony from a vocational

expert ("VE"), with hypothetical assumptions based on Schubert's RFC.   The VE testified that

such a person would be able to work at light, unskilled occupations, such as a labor coder for

parts or bench worker for small parts, or in the light, semi-skilled occupation of a dispatcher of

maintenance.  *Id.* at 621.  Thus, the ALJ concluded that Schubert was not disabled within the

meaning of the Social Security Act.  *Id.* at 34.

## <u>STANDARD OF REVIEW</u>

The reviewing court must affirm the Commissioner's decision if the Commissioner

applied the proper legal standards and the findings are supported by substantial evidence in the

record.  42 USC § 405(g); *Batson v. Comm'r for Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir

2004).  "Substantial evidence" means "more than a mere scintilla, but less than a

preponderance."  *Bray v. Comm'r of the Soc. Sec. Admin*, 554 F3d 1219, 1222 (9th Cir 2009),

---

[2]  Past relevant work is work that a claimant performed within the last fifteen years, which lasted long
enough for him to learn to do it, and was substantial gainful activity (SGA).  20 CFR §§ 404.1565(a), 416.965(a).
SGA is work done for pay or profit involving significant physical and mental activities.  20 CFR §§ 404.1574,
416.974.  Schubert showed no earnings for his tractor/trailer business, general merchandise store, or his apartment
complex and, thus, work associated with those businesses was not included as his past relevant work.

quoting *Andrews v. Shalala*, 53 F3d 1035, 1039 (9th Cir 1995).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id.*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading.  *Id.* at 1093; *see also Batson*, 359 F3d at 1193.

## FINDINGS

### I.    Claims of Error

Schubert asserts four claims of error.  First, he contends that the ALJ failed to evaluate his RFC accurately because he discounted Schubert's testimony and rejected the opinion of a treating physician without articulating legally sufficient reasons.  Schubert next argues that the ALJ failed to give proper weight to a rating decision by the Department of Veterans Affairs ("VA").  Lastly, he challenges the VE testimony as based on hypothetical assumptions that did not accurately reflect all of his functional limitations.

### II.    Credibility Determination

#### A.    Schubert's Testimony

In his July 6, 2004 function report and pain questionnaire, Schubert indicated he had physical limitations in lifting, bending, reaching, sitting, and using his hands, and mental limitations in his ability to complete tasks and concentrate.  Admin. R. 127.  He reported constant

"burning, aching, and stinging" pain, and numbness in his neck, shoulders, and arms which worsened by using his arms or putting his head in the wrong position. *Id.* at 130. He could be active for one to two hours before requiring rest, drives, takes daily walks, and does not require assistance with household chores. *Id.* at 131-32. Schubert feeds his dogs, prepares his own simple meals, and attends to his personal needs, grooming, and medications without assistance. *Id.* at 123-24. He engages in hobbies of reading, watching television, and playing games "all the time." *Id.* at 126.

In October 2007, Schubert testified that he has suffered extreme headaches since his last neck surgery in 1999. *Id.* at 571. Neck and shoulder tension caused by normal activities render him nonfunctional. *Id.* at 571-72. He is unable to look up or down for very long and has a very limited ability to perform tasks at desk level. *Id.* He has very limited side-to-side range of motion and looks straight forward most of the time. *Id.* at 575-76. Schubert estimated he could sit for a few hours, as long as nothing was pushing on his neck or shoulders. *Id.* at 574.

**B.    ALJ's Findings**

The ALJ accepted Schubert's subjective claims of ongoing pain from his history of neck injury and surgeries resulting in significant limitations in his exertional capacity and cervical range of motion as reflected in the RFC assessment. *Id.* at 27, 30. However, "[a]fter considering the evidence of record," the ALJ found that Schubert's "statements concerning the intensity, persistence, and limiting effects of his impairments are not entirely credible" to the extent they suggested functional limitations in excess of the RFC assessment. *Id.* Rejecting Schubert's claim that his headaches/neck pain render him "nonfunctional" for two days every two to three weeks, the ALJ gave three specific reasons: (1) Schubert's February 2005 inconsistent statement

to Dr. Brown "that he had lived with <u>mild</u> pain for many years and that sometimes it got a little

worse for a few days.  He was always able to find a position to lie down or hold his neck so that

he did not have pain;" (2) the medical evidence ("x-rays show stable, solid fusions:  MRI

findings are consistent with mild degenerative joint disease; and EMG findings are normal"); and

(3) "numerous references to activities [Schubert] has participated in during the relevant period

that are contrary to his alleged limitations."  *Id*. at 30-31.

C.    **Legal Standards**

The ALJ must consider all symptoms and pain which "can be reasonably accepted as

consistent with the objective medical evidence, and other evidence."  20 CFR §§ 404.1529(a),

416.929(a).  Once a claimant shows an underlying impairment which may "reasonably be

expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ

must provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter*,

504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).  The ALJ's

credibility findings must be "sufficiently specific to permit the reviewing court to conclude that

the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F3d 748,

750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).

Examples of clear and convincing reasons include conflicting medical evidence, effective

medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent

with the alleged symptoms, a sparse work history, or testimony that is vague or less than candid.

*Tommasetti v. Astrue*, 533 F3d 1035, 1040 (9th Cir 2008).

The ALJ may consider objective medical evidence and the claimant's treatment history,

as well as the claimant's daily activities, work record, and observations of physicians and third

parties with personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F3d at 1284.  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant.  *Id.*

Credibility determinations are within the province of the ALJ.  *Fair v. Bowen*, 885 F2d 597, 604 (9th Cir 1989), citing *Russell v. Bowen*, 856 F2d 81, 83 (9th Cir 1988).  Where the ALJ has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record, the role of the reviewing court is not to second-guess that decision. *Id.*

### D.    Analysis

Because there is no evidence of malingering, the ALJ must provide clear and convincing reasons to reject Schubert's subjective pain and symptom testimony based on his neck pathology. Schubert contends that he failed to do so.  Because the ALJ's decision reflects substantial evidence in the record regarding the appropriate factors in assessing Schubert's credibility, his determination should be upheld.

### 1.    <u>Inconsistent Statement</u>

At his October 2007 hearing, Schubert testified that since his last surgery in 1999, he has experienced two-day periods where he is nonfunctional, "usually once every two, three weeks." Admin. R. 571, 574, 586, 588.  During these periods, he is forced to lie in his recliner and not do anything else.  *Id.* at 589.

The ALJ correctly pointed out that when Schubert sought treatment for his neck pain from Dr. Brown on February 23, 2005, he reported living with "mild pain for many years."  *Id.* at 30, 280.  Schubert told Dr. Brown that his pain "sometimes gets a little worse for a few days,"

but he has "always been able to find a position to lie down or hold his neck so that he does not have pain; and usually the more acute episodes resolve after a few days." *Id.* at 280. He also stated that after doing some work outside during the previous week, he felt a shifting in his neck that caused a "constant burning sensation" in his neck and upper thoracic region, for which he took some Norco left over from several years ago. *Id.* Due to "his inability to get away from the pain," he became "extremely depressed" and "so upset one night that he called the suicide hotline." *Id.* Dr. Brown administered a shot of Demerol for his neck pain, prescribed Norco, and referred him to a neurosurgeon. *Id.* at 279.

Contrary to the ALJ's conclusion, Schubert's testimony and report to Dr. Brown are not entirely inconsistent. Schubert reported to Dr. Brown a history of chronic neck pain since his last fusion surgery which sometimes gets worse for a few days requiring him to lie down or hold his neck with more acute episodes that take a few days to resolve. True, Dr. Brown characterized Schubert's chronic neck pain as "mild," but the acute episodes he reported to Dr. Brown are consistent with his testimony concerning the severe episodes rendering him nonfunctional for a few days every two to three weeks. Thus, Schubert's statements to Dr. Brown do not provide a clear and convincing reason to find Schubert not credible.

### 2. **Objective Medical Evidence**

To discredit Schubert, the ALJ also relied on the x-rays, MRI findings, and EMG findings which revealed no problem. As the ALJ correctly noted, the MRI in August 2006 showed "mild degenerative changes," "without evidence for critical canal or foraminal stenoses," and the November 2006 EMG study was normal. *Id.* at 28, 481, 507.

Paul G. Amstutz, M.D., a neurologist, took x-rays in March 2005 the week after Schubert saw Dr. Brown. When summarizing the medical evidence, the ALJ noted that Dr. Amstutz examined Schubert for "severe neck and headache" pain that started about six weeks before "when he was digging in his yard." *Id.* at 28, 269. Schubert testified that his neurologist told him his T-1 was "actually disintegrating" and "blowing out." *Id.* at 584, 589. However, as the ALJ correctly noted, despite finding range of motion limitations and a cervical sprain with possible disk displacement (*id*. at 272), Dr. Amstutz noted that the x-rays showed a "stable" cervical spine post fusion at levels C3 through C7 with no "greatly pathologic" movement and some cervical spondylosis at C2-3 and C7-T1 present in the facet joint structure (*id*. at 274). *Id.* at 28. Thus, the diagnostic imaging and objective medical evidence conflicts with Schubert's testimony that his T-1 vertebrae was disintegrating and blowing out.

Although not specifically listed as a reason to discredit Schubert, the ALJ's summary of the medical evidence states that on December 30, 2005, Schubert received treatment at the VA for stomach and neck pain. *Id.* at 28, 363-369. He reported having daily headaches and taking three Excedrin daily. *Id.* at 365. However, as the ALJ also noted, that same day, Schubert denied any "muscle weakness in extremities or pain in joints" and also denied "any numbness or tingling in extremities, headaches or dizziness." *Id.* at 28, 368.

Other substantial evidence in the medical record undermines Schubert's claims, although not specifically cited by the ALJ. Schubert testified that when he experienced two-day down periods due to debilitating headaches, he had to get a shot of Demerol from his local doctor to break the cycle. *Id.* at 577-78. However, the medical record shows that Schubert received only

five Demerol shots from 2000 to 2007, two of which were given for abdominal pain. *Id.* at 280, 288-89, 438-39. This infrequent treatment contradicts Schubert's statements.

Schubert also asserts he had to take Norco for relief from his severe headaches, stating he took "1 Norco a day" in his July 6, 2004 pain questionnaire. *Id.* at 131. However, after Schubert's alleged onset date, the medical record shows that Dr. Morris prescribed 60 pills of Norco on September 30, 2002. *Id.* at 292. Yet when Schubert sought treatment for his neck pain almost two years later on July 15, 2004, Dr. Morris did not authorize an additional prescription based on Schubert's report that he still had Norco. *Id.* at 283. The medical record additionally shows Schubert was prescribed 20 pills of Norco on February 23, 2005 (*id.* at 279), and 30 pills over two years later on June 19, 2007, after getting hit in the face. *Id.* at 438, 584. The record simply does not support Schubert's claim that he took one Norco per day or heavily relied on it for two-day debilitating headaches every two to three weeks.

Furthermore, there is a paucity of evidence in the medical record regarding Schubert's treatment for his headaches and neck pain. Between June 2000 and July 2004, he sought treatment only twice for his neck pain: in March 2001 (*id.* at 295) and on September 30, 2002, for neck pain which was "exacerbated by extreme physical activity." *Id.* at 292.

The ALJ cannot reject a claimant's symptom testimony "solely because" it "is not substantiated affirmatively by objective medical evidence." *Rollins v. Massanari*, 261 F3d 853, 883 (9th Cir 2001). Nevertheless, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects. *Id.* at 857; 20 CFR §§ 404.1529(c)(2), 416.929(c)(2); *also see Burch v. Barnhart*, 400 F3d 676, 680 (9th Cir 2005). Here, the ALJ did not reject Schubert's symptom testimony solely based on a lack of objective medical evidence,

but instead considered medical evidence which contradicted Schubert's testimony and, as discussed below, his daily activities. Thus, the ALJ provided a clear and convincing reason for finding Schubert not fully credible based on the medical evidence.

### 3.    Contrary Activities

With respect to Schubert's activities contrary to his alleged limitations, the ALJ highlighted discrepancies involving Schubert's Roseburg house. Admin. R. 31. On June 17, 2007, Schubert sought treatment at the VA Urgent Care for asthma exacerbation, which was triggered the day before when he was "[w]orking on a house that has a large tree in full bloom." *Id.* at 463. Schubert explained at the January 2008 hearing that this house was located in Roseburg and that he had hired a general contractor to restore it approximately one year and a half earlier. *Id.* at 607-609. Schubert clarified that he had not been working on the house, but had been on-site, supervising his contractor. *Id.* at 608. The ALJ concluded, however, that Schubert "alleges that he can't pay his bills because he has no money and at his hearing he testified that he lost all of the money he received in his $1,000,000 settlement due to bad business deals, but he also had a house in downtown Roseburg that he was having restored by a contractor." *Id.* at 31, 125, 614-15. The court must sustain an ALJ's inferences reasonably drawn from the record. *Batson*, 359 F3d at 1193. To infer that Schubert had the money to restore his home in Roseburg despite his testimony that he lost all of his money is not inherently unreasonable. *Id.* at 31, 615.

Schubert also testified that his contractor was redoing the foundation work, rebuilding some of the walls, replacing windows, working on the plumbing, and doing electrical work. Admin. R. 608-09. The ALJ thus inferred that Schubert made regular trips from Grants Pass to

Roseburg, "a distance of 54 miles one way, as the crow files [sic]. " *Id.* at 31. However, the

record does not reveal how often Schubert traveled to Roseburg or whether he drove himself.

Absent that information, the ALJ's inference lacks a reasonable basis.

Although not specifically cited as additional reasons to discredit Schubert, the ALJ's

decision refers to other activities by Schubert contrary to his alleged limitations. The ALJ noted

that in his disability report, Schubert stated that he stopped working on December 31, 2001,

because of a neck injury. *Id.* at 27, 100. However, the medical record shows no treatment for his

neck between his last fusion surgery in 1999 and December 31, 2001, other than in March and

September 2001. *Id*. at 293-95. In September 2001, Schubert saw Dr. Morris for a physical

examination to renew his commercial driving license. *Id.* at 293-94. Although the standards and

extent of testing is not fully explained in the record, the ALJ accurately recited Dr. Morris'

finding that Schubert had "no musculoskeletal or neurologic conditions" and "no limitation in

range of motion or physical function." *Id.* at 27, 293.

According to a work history report completed by Schubert, he was a "driver owner" of a

"tractor trailer" from September 2001 until September 2002. *Id.* at 106. In that position,

Schubert wrote that he drove the truck, tied down loads, and kept a log book, and walked for two

hours, stood for one hour, and sat for nine hours during his workday of "10 hours per day," "7?

days per week. " *Id.* at 108. This report is inconsistent with Schubert's alleged limitations. The

ALJ may consider a claimant's prior work history when evaluating the intensity and persistence

of symptoms. 20 CFR §§ 404.1529(c)(3), 416.929(c)(3). Although this work occurred prior to

June 30, 2002, and did not constitute substantial gainful activity (Admin R. at 25), it is still

relevant to the ALJ's analysis.

14 - FINDINGS AND RECOMMENDATION

Schubert then continued to work as a store owner until October 2004, when he closed his general mercantile store. *Id.* at 106. The ALJ commented that Schubert's testimony regarding his work as a store owner was "significantly contrary" to what Schubert self-reported on his work history form. *Id.* at 28. That form specifically asked Schubert what *he* did in *his* job, and not, as he now argues, what a typical employee would do in the same job. *Id.* at 107. Schubert responded that he worked eight hours per day, five days per week, spent most of his time waiting for customers, walked for three hours, stood for four hours, and sat for one hour during his workday. *Id.* at 27, 107. The ALJ further found that Schubert reported "although he generally lifted less than 10 pounds, he occasionally lifted up to 50 pounds," and his "workday also involved writing or handling small objects for an hour." *Id.* However, during the January 2008 hearing, Schubert testified to the contrary that he "wouldn't call it working," but instead, "laying around." *Id.* at 603-04. "[M]ost of the time," he stated, he sat around on a lounge chair, watching television and relaxing, or taking a nap "half the time" because he "never had any business." *Id.* at 602-03. Given that Schubert's oral testimony contradicted his prior written testimony, the ALJ did not err in considering these discrepancies.

The medical record also includes references to activities inconsistent with Schubert's alleged limitations. In addition to his severe headaches, Schubert stated he was unable to look up or look down for very long, and it was second nature for him to spend all of his time trying to avoid a headache. *Id.* at 28, 571-573. In contrast, however, Schubert saw Dr. Morris on July 15, 2004, and reported throbbing headaches associated with his neck discomfort which "started about three weeks ago after doing some river rafting." *Id.* at 283. At the January 2008 hearing, Schubert testified that he had gone rafting with his sister in the Rogue River to "just float down

the river," but when he got off, he slipped on some rocks and gave himself a "good jolt" for which he sought a pain shot afterward. *Id.* at 610-11. That explanation is quite different than his report to Dr. Morris. Furthermore, as the ALJ concluded, rafting on the Rogue River is not consistent with his alleged limitations.

On September 30, 2002, Dr. Morris treated Schubert for his asthma and refilled his Norco prescription for "chronic neck pain exacerbated by extreme physical activity." *Id.* at 292. When the ALJ asked him to clarify this "extreme physical activity," Schubert did not provide an explanation, but merely responded he was "not sure where they [got] that from." *Id.* at 608.

Lastly, contrary to Schubert's alleged physical limitations in lifting ("can't lift much at all"), bending ("my neck is a killer"), and reaching ("causes pain in neck"), Schubert admitted to "doing a fair amount of outdoor work on his acreage at home." *Id.* at 127, 612-13. He testified that two years prior (in 2006), he and a friend cut trees on the two acres of land, as requested by the Forest Service. *Id.* at 612-13. Although he denied making "a whole day of it," Schubert said he did light physical work, collecting and stacking small branches, and lighting the match to burn them. *Id.* at 615-16.

In summary, the record does not support Schubert's testimony about the severity his headaches and other alleged limitations. Based on a lack of evidence, the ALJ erred in inferring Schubert regularly drove to his home in Roseburg, but he did not err in citing numerous discrepancies between Schubert's activities and testimony in his findings. Although the evidence of Schubert's daily activities may also admit of an interpretation more favorable to Schubert, the ALJ's interpretation was rational, and the court "must uphold the ALJ's decision where the

evidence is susceptible to more than one rational interpretation." *Burch*, 400 F3d at 680-81,

citing *Magallanes v. Bowen,* 881 F2d 747, 750 (9th Cir 1989).

**E.    Credibility Conclusion**

Although his finding regarding Schubert's inconsistent statement to Dr. Brown cannot be

sustained, the ALJ provided other clear and convincing reasons, based on substantial evidence in

the record, for finding Schubert's symptom testimony not entirely credible.  The ALJ's overall

credibility decision may be upheld even if not all of the ALJ's reasons for rejecting the

claimant's testimony are upheld.  *Batson*, 359 F3d at 1197.  The objective medical evidence and

Schubert's activities were inconsistent with Schubert's statements concerning the intensity,

persistence, and limiting effects of his symptoms.  When evidence reasonably supports either

confirming or reversing the ALJ's decision, the court may not substitute its judgment for that of

the ALJ. *Id.* at 1196, citing *Tackett*, 180 F3d at 1098.  Therefore, the ALJ's determination should

be upheld.

**III.    Treating Physician**

Schubert next claims the ALJ improperly rejected the opinion and ultimate conclusions of

his treating neurosurgeon, Aaron Filler, M.D., at UCLA School of Medicine, regarding the

severity of his impairments.  In particular, Schubert argues that the ALJ should have considered

Dr. Filler's July 15, 1999 report stating that he had "increasingly severe problems with his low

neck radiating out into the left arm involving his first, second and third digits" and that his pre-

existing problem and subsequent motor vehicle accident have sent him "into a chain of events

which have led to really a quite disabling problem."  Admin. R. 211-12.  Schubert asserts that

this opinion is evidence of his disability and lack of capacity for work.

Schubert also claims that the ALJ should have given weight to Dr. Filler's December 13, 1999 assessment stating that the anesthetic block provided "only very transient relief and [Schubert] continues to have quite significant pain." *Id.* at 181. Dr. Filler additionally noted that Schubert "says that although there is really no pain with neck movement, the pain is triggered by arm movements and is really significantly limiting his ability to use the arm." *Id.*

### A.    <u>Legal Standard</u>

The ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician. *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995). The ALJ must also generally give greater weight to the opinion of an examining physician over that of a reviewing physician. *Id.* To reject an uncontradicted opinion of a treating or examining doctor, the ALJ must state clear and convincing reasons that are supported by substantial evidence. *Bayliss v. Barnhart,* 427 F3d 1211, 1216 (9th Cir 2005), citing *Lester,* 81 F3d at 830-31. If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons, supported by substantial evidence. *Id.* Opinions of specialists concerning matters relating to their specialty are given more weight than the opinions of non-specialist, treating physicians. 20 CFR §§ 404.1527(d)(5), 416.927(d)(5).

When evaluating conflicting medical opinions, the ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings. *Id.*, citing *Tonapetyan v. Halter*, 242 F3d 1144, 1149 (9th Cir 2001). An ALJ may reject a physician's opinion that is premised on the claimant's subjective statements which the ALJ finds unreliable; the physician's opinion is no more credible than the statements upon which it is based. *Bray*, 554 F3d at 1228 n8; *Tonapetyan*, 242 F3d at 1149.

### B.    Analysis

The ALJ referred to Schubert's UCLA medical records from 1999 referencing the history of Schubert's surgeries and Dr. Filler's assessment from April 1998.  Admin. R. 27, 238. However, the ALJ did not directly address Dr. Filler's July 15, 1999 statement about Schubert's "disabling problem" and December 13, 1999 statement that Schubert's neck pain "is triggered by arm movements and is really significantly limiting his ability to use the arm."  Instead, the ALJ pointed to the post-surgical CT scan assessment in October 1999 by Dennis Zander, M.D. and John Bentson, M.D., non-treating, non-examining physicians, finding anatomic alignment, mildly narrowed C5-6 foramen, and "no findings of complications" of Schubert's cervical spine. *Id.* at 27, 182.  However, the ALJ did not provide clear and convincing reasons for giving that assessment greater weight than Dr. Filler's opinions.  That failure constitutes legal error.

Nevertheless, the ALJ's evaluation of Dr. Filler's assessment does not provide a basis for reversal.  Dr. Filler's opinion that Schubert had a "disabling problem" is cited by Schubert as support for the ultimate conclusion that he is disabled for purposes of obtaining disability benefits.  Medical opinions about the nature and severity of a claimant's impairments must be considered in evaluating a claimant's entitlement to benefits.  20 CFR §§ 404.1527(a)(2), 416.927(a)(2).  However, the ultimate determination of disability is an issue reserved for the Commissioner.  20 CFR §§ 404.1527(e)(1) & (3), 416.927(e)(1) & (3).

Moreover, a decision to deny benefits will only be disturbed if it is not supported by "substantial evidence or it is based on legal error."  *Burch*, 400 F3d at 679, citing *Magallanes,* 881 F2d at 750.  A decision of the ALJ will not be reversed for errors that are harmless.  *Id.*; *see also Curry v. Sullivan,* 925 F.2d 1127, 1131 (9th Cir 1991).  For an error to be held harmless, it

19 - FINDINGS AND RECOMMENDATION

must be inconsequential to the ultimate non-disability determination. *Stout v. Comm'r for Soc. Sec. Admin.*, 454 F3d 1050, 1055-56 (9th Cir 2005). The record reveals that the ALJ's error regarding Dr. Filler's opinion is harmless.

Dr. Filler's July 15, 1999 statement is three months before Schubert's last surgery in October 1999. In September 2001, some two years after Dr. Filler's assessment and about a year before Schubert's insured status expired, Dr. Morris performed a physical examination of Schubert and found no limitations or restrictions. Admin. R. 27, 293. At that examination, Schubert reported himself "in good health," with "no musculoskeletal or neurologic conditions,"and "no limitation in range of motion or physical function." *Id.* at 27, 294.

Later medical records are consistent with this lack of debilitating findings. In March 2005, treating neurosurgeon Dr. Amstutz found that Schubert's cranial nerves were grossly normal, cervical spine alignment was normal, cervical range of motion was approximately "75% of normal" and rotation was unencumbered. *Id.* at 270-71. The ALJ also noted Dr. Amstutz's x-ray report showing a stable cervical spine. *Id.* at 28, 274. Since Dr. Amstutz is a specialist who examined and treated Schubert, his opinion is entitled to as much weight as Dr. Filler's opinion.

Similarly, at the VA clinic in December 2005, Schubert denied any muscle weakness, pain in his joints, numbness or tingling in his extremities, and headache. *Id.* at 28, 368. The medical record also shows that when Schubert sought treatment for chest pain in early June 2007, he reported that his headache frequency remained the same, but the severity of his headaches had decreased, and that he was usually able to control the headache with Midrin. *Id.* at 468.

The ALJ's finding that Schubert is not disabled is supported by substantial evidence in the record. Thus, omitting Dr. Filler's opinion was appropriate both because it concerned an issue reserved for the Commissioner and because it constitutes harmless error.

## IV.    VA Disability Rating

Schubert asserts that the ALJ erred by failing to give proper weight to the VA rating decision of November 29, 2005, which granted him a nonservice-connected pension after finding he was "unable to secure and follow a substantially gainful occupation due to disability." *Id*. at 92. The VA gave Schubert a rating of 80% for his combined disabilities based on his neck condition, asthma, headaches, and dysthymia and anxiety. *Id.* at 93. The VA assessed that Schubert's neck pain and reduced range of motion would impair employability of a physical nature, and his chronic headaches would impair any type of vocation requiring concentration, as well as preclude vocational rehabilitation. *Id.* at 31, 92.

### A.    <u>Legal Standards</u>

Although a VA rating of disability does not necessarily compel the SSA to reach an identical result, 20 CFR §§ 404.1504, 416.904, the ALJ must ordinarily give great weight to a VA determination of disability. *McCartey v. Massanari*, 298 F3d 1072, 1076 (9th Cir 2002); SSR 06-03p, 2006 WL 2329939, at *7. Because the VA and SSA criteria for determining disability are not identical, the ALJ may give less weight to a VA disability rating based on persuasive, specific, and valid reasons which are supported by the record. *Id.* The acquisition of new evidence or a properly justified re-evaluation of old evidence may constitute a persuasive, specific, and valid reason supported by the record. *Valentine v. Astrue*, 574 F3d 685, 695 (9th Cir 2009).

21 - FINDINGS AND RECOMMENDATION

**B.**    **Analysis**

The ALJ gave the following reason for discounting the VA rating:

> [T]he objective studies show evidence of multilevel neck fusions
> with only mild degenerative joint disease.  While his neck
> pathology causes *some* limitation, the claimant still participates in a
> wide range of activities and his impairments do not rule out work
> per the Regulations. As well, there is no evidence that the claimant
> has a problem with concentration.

Admin. R. 31 (emphasis in original).

These reasons are all supported by the record.  As noted earlier, there are few records

reflecting treatment of neck pain between Schubert's last surgery in 1999 and his date last

insured.  Additionally, medical records after the date last insured do not reflect disabling

impairments or symptoms.

Schubert's August 2006 MRI showed "mild degenerative changes," "without evidence

for critical canal or foraminal stenoses," and his November 2006 EMG study was normal.  *Id.* at

28, 491, 507.  As previously discussed, Schubert continued to participate in a wide range of

activities, and the ALJ reasonably discredited Schubert's pain testimony.  At the January 2008

hearing, the ALJ also benefitted from the input of the VE who assessed and testified regarding

work that Schubert could perform in the national economy.  *Id.* at 617-26.  Further, the record

lacks substantial evidence supporting Schubert's significant difficulty with concentration.

Neither of the two DDS physicians who completed Psychiatric Review Technique Forms in

September 2005 and April 2006 assessed Schubert with even moderate difficulties in maintaining

concentration, persistence, or pace.  *Id.* at 338-340, 423-425.

The ALJ also considered additional evidence which was not available to or considered by

the VA.  The evidence considered by the VA consisted only of Dr. Brown's reports from May 1,

22 - FINDINGS AND RECOMMENDATION

2000, through July 18, 2005, and various VA treatment records from July 2005 through

November 2005.  *Id.* at 91.  In contrast, the ALJ considered the following additional evidence:

the testimony at the October 2007 and January 2008 hearings; Schubert's work history reports

(*id.* at 106-21), function report (*id.* at 122-29), and disability report (*id.* at 99-105); UCLA

medical records from April 1998 through December 1999 (*id.* at 178-267); Dr. Amstutz's records

from March 2005 (*id.* at 268-74); Grants Pass Clinic records from August 2005 through January

2006 (*id.* at 344-46) and September 2006 through June 2007 (*id.* at 437-39); two Residual

Functional Capacity Assessments (*id.* at 320-27, 429-36); two Psychiatric Review Technique

Forms (*id.* at 328-41, 413-28); and VA medical records from July 2005 through August 2007 (*id.*

at 347-412, 440-530).

Thus, the ALJ reasonably considered the VA rating and provided persuasive, specific and

valid reasons, all supported by the record, for giving it less weight.  Accordingly, the ALJ's

rejection of the VA disability rating should be upheld.

## V.    **Vocational Evidence**

Finally, Schubert argues the ALJ elicited testimony from the VE based on hypothetical

assumptions that did not accurately reflect all of his functional limitations.  The ALJ's

hypothetical question to the VE was based on the assumptions that Schubert was under 50 years

of age at the onset date with a high school education plus additional training; could sit, stand, or

walk six hours each in an eight-hour day; was limited from frequently lifting and carrying more

than 10 pounds, with an occasional 20-pound maximum; was restricted from using ladders or

scaffolds, reaching overhead, and crawling; and had to avoid extreme neck motions, and

excessive dust or fumes.  Admin. R. 620.  The VE concluded Schubert could not perform his past

relevant work as a camera car driver, but could perform light duty work activities required in the occupations of labor coder for parts, bench work for small parts salvage, and maintenance dispatcher. *Id.* at 621. The VE further concluded that Schubert had transferable skills such as mechanical abilities, understanding parts needs, and understanding priorities. *Id.* at 622.

Schubert's attorney asked the VE to consider a hypothetical with the following additional limitations: neck injury condition requiring no jarring motions to the neck; extremely limited range of motion of the neck, particularly up and down; and periodic headaches causing the worker to unpredictably miss more than two days per month. *Id*. at 623-24. The VE responded that these additional limitations would eliminate all jobs in the competitive national labor market. *Id.* at 624.

The ALJ was not required to incorporate limitations based on properly discounted evidence. *Batson*, 359 F3d at 1197-98; *Osenbrock v. Apfel*, 240 F3d 1157, 1164-65 (9th Cir 2001). The ALJ considered all the evidence and reached an RFC assessment based on the limitations supported by the record as a whole. The ALJ elicited testimony from the VE based on that RFC assessment. Because the hypothetical assumptions "contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record," the ALJ properly relied on the VE's testimony. *Bayliss*, 427 F3d at 1217. Thus, Schubert's contention that the ALJ's determination was based on improper vocational testimony should not be sustained.

///

///

///

24 - FINDINGS AND RECOMMENDATION

## RECOMMENDATION

The Commissioner's decision that Schubert did not suffer from disability, and is not entitled to benefits under Titles II and XVI of the Social Security Act, is based upon correct legal standards and supported by substantial evidence.  For the reasons set forth above, the Commissioner's decision should be AFFIRMED.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due  August 26, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.  If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 9th day of August, 2011.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

25 - FINDINGS AND RECOMMENDATION